Filed 12/9/14  Marriage of Portener CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re the Marriage of Susan and David Portener.

SUSAN E. PORTENER,

     Appellant,

v.

DAVID B. PORTENER,

     Respondent.

E057562

(Super.Ct.No. IND100454)

**OPINION**

APPEAL from the Superior Court of Riverside County.  J. Michael McCoy and

Gregory J. Olson, Temporary Judges.  (Pursuant to Cal. Const., art VI, §21.)  Affirmed.

Sheila A. Williams and Laura J. Fuller, for Appellant.

No appearance for Respondent.

1

On May 25, 2010, appellant Susan E. Portener (Susan) filed a petition for dissolution of marriage to respondent David B. Portener (David). Susan and David had one adult child. Susan sought spousal support, attorney fees, and the determination of rights to the community property.

A court trial was held on the disputed issues as relevant here: [A] determination of the value of the business owned by Susan and David called Palm Springs Desert Media (PSDM); value of a residence they owned in Palm Desert; Susan's attorney fees; and Susan's allegation that David had breached his fiduciary duty. On September 7, 2012, an eight-page statement of decision was signed by the trial court. No objections were filed by either party and the dissolution judgment was final on September 19, 2012.

Susan contends on appeal as follows: (1) the trial court failed to use accepted business valuation principles and practices when ruling on the business valuation of PSDM; (2) the trial court erred in awarding David negative equity in the marital residence; (3) David breached his fiduciary duty to her; and (4) David should have been ordered to pay the full amount of her attorney fees.

We provide a brief procedural background and examine the facts and law relating to each of these contentions separately.

# I

## PROCEDURAL BACKGROUND

David has not filed a respondent's brief. California Rules of Court, rule 8.220(a)(2), provides that when a party fails to file a responsive brief "the court may decide the appeal on the record, the opening brief, and any oral argument by the appellant." "The rule we follow in such circumstances 'is to examine the record on the basis of appellant's brief and to reverse only if prejudicial error is found. [Citations.]' [Citations.]" (*Lee v. Wells Fargo Bank* (2001) 88 Cal.App.4th 1187, 1192, fn. 7.)

According to the petition filed by Susan, she and David were married on November 24, 1989, and had separated on May 18, 2010. They had no minor children. David filed a response which stated he was self employed at PSDM. Prior to trial, in September 2010, Susan and David agreed that she would pay all of the household expenses, she would live in their home in Palm Desert, and David would live in the recreational vehicle (RV) they owned.

Susan and David reached another agreement on April 13, 2011 (4/11 agreement). According to the 4/11 agreement, David would have exclusive use and possession of the Palm Desert home and would have exclusive control of PSDM. David would continue to run PSDM to the best of his ability and send Susan monthly financial reports. David would pay the household debts and PSDM debts. Beginning on May 1, 2011, PSDM would pay Susan $3,000 per month. There was no agreement as to payment of attorney fees. The trial court signed the order on April 29, 2011.

A trial on the disputed issues began on June 6, 2011. The trial court initially heard the matter of sanctions requested by Susan under Family Code section 271. After the hearing, the trial court denied sanctions finding both parties were equally at fault for how they dealt with each other.

The remaining issues were heard over eight days in August 2012. The trial court issued an eight-page statement of decision on September 7, 2012. There were no objections to the decision. On September 19, 2012, the decision was final. In pertinent part and as will be discussed in more detail, *post*, the trial court ruled as follows: (1) PSDM was valued at $320,000 and awarded to David; (2) Susan was to receive spousal support of $4,500 each month until her death or remarriage; (3) David was to pay an equalization payment of $23,800 to Susan from the sale of their vacation home in Canada; (4) David was to sell both their car and RV and split the proceeds with Susan; (5) the Palm Desert house was awarded to David and was valued at $420,000 with $391,460 mortgage debt for a total award of $28,540; (6) David was given negative equity of $299,940 for home equity line of credit (HELOC) debt on the Palm Desert house; and (7) David was to obtain a life insurance policy in the amount of $500,000 with Susan as the beneficiary. The trial court split the remaining assets equally. Susan was awarded a portion of her attorney fees. The trial court also found that there had been no breach of fiduciary duty by David. The trial court found that the marital standard of living was upper middle class with an annual income ranging from $150,000 to $200,000.

Susan filed a notice of appeal on November 15, 2012, pursuant to Code of Civil Procedure section 904.1, subdivision (a)(1).

4

VALUATION OF FAMILY BUSINESS

Susan claims that the trial court erred in its valuation of PSDM. She insists that PSDM should have been valued at $508,000 rather than $320,000.

A.    *Valuation of Businesses*

Generally, the family court is obliged to divide the community estate equally. (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631 (*Duncan*).) "In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal. [Citations.]" (*Id* at pp. 631-632.) "A family court's discretion in dividing marital property includes the authority to award a marital business to one spouse as a means to achieve equity in the division of property. [Citations.]" (*In re Marriage of Gréaux and Mermin* (2014) 223 Cal.App.4th 1242, 1251.)

In *Duncan, supra,* 90 Cal.App.4th 617, the court discussed that it was difficult to give a value to a closely held corporation for purposes of allocating it to the parties. (*Duncan,* at p. 632.) It noted that in exercising that discretion, the court "'makes an independent determination of value based upon the evidence presented on the factors to be considered and the weight given to each. The trial court is not required to accept the opinion of any expert as to the value of an asset.' [Citations.] Differences between the

experts' opinions go to the weight of the evidence. [Citations.] Rather, the court must determine which of the recognized valuation approaches will most effectively achieve substantial justice between the parties. [Citation.]" (*Ibid.*)

One court has determined that "[T]he fair market value of a marketable asset in marital dissolution cases is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no obligation or urgent necessity to do so, and a buyer, being ready, willing and able to buy but under not particular necessity for so doing." (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 89.) The court in *Cream* emphasized it was the trial court's duty to value the asset, no matter how difficult. (*Id.* at pp. 89-90.)

"'Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test.' [Citation.]" (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421.) A trial court's exercise of discretion "will be disturbed only for clear abuse. . . " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Moreover, it is well-established that the "trial court's judgment is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citation.]" (*In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670.)

B.    *Evidence and Findings*

David and Susan purchased PSDM in 2002 for $40,000. PSDM was a distributor of a bimonthly magazine that was placed in hotels and other tourist attractions. PSDM sold advertisements and sometimes also took trade with restaurants or other companies but did not report the trades as income.

In 2009, David was away from the business for one year while he worked for another company. At that time, Susan and David hired a manager, Bob Marra, to run the business. David negotiated an option for Marra to purchase PSDM for $800,000. Marra never exercised the option. In an effort to possibly settle the dissolution, both Susan and David hired Adam Ochoa to do a valuation of PSDM. He provided a valuation of PSDM as of December 31, 2009. Ochoa only performed a limited determination of value. He concluded that the fair market value at that time was $404,881. He based this on an average of an asset-based approach to valuation, an income-based approach to valuation, and a market value approach.

At trial, both parties presented experts as to the value of PSDM. Susan's expert, Lynne Bushore, stated that the value of PSDM was $508,000 and the discretionary cash flow for 2011 was $16,936 and for the first half of 2012 was $19,215. She based her value on three different approaches: asset approach, income approach and market approach. She used tax returns and accounting from PSDM. For the market approach, she used "Bizcomps" which was a compilation of other businesses sold which she determined averaged $431,000 (which included one business that was sold in Las Vegas in 2005 for $292,000) and also the $800,000 option to purchase signed by Marra.

David's expert, Ochoa, did a second valuation of the business as of December 31, 2011. He also used an average of the asset-based approach, the income-based approach and market approach to reach the final value as $258,327 and discretionary cash flow as $5,974. In the market value approach, he referred to a sale of a business in Las Vegas in 2005 for $290,000.

Both experts criticized the calculations used by the other expert. Bushore complained Ochoa misstated the income numbers and did not include the accounts receivable in the assets. Ochoa explained that he did not include the accounts receivable because they were old and likely not recoverable. He insisted the $800,000 option to purchase should not have been included in the market value. There was also testimony presented that PSDM was a distributorship of a magazine and such distributorship franchise was worth $60,000.

In its statement of decision, the trial court discussed the evidence that Susan and David started PSDM in 2002 for $40,000. The business was the primary income for the family. They purchased a house in Palm Desert, a vacation home in Canada, a boat, two cars, and an RV. They paid for vacations and their son's college education. It also referred to evidence that in 2009, David took a job in Dallas and earned $150,000. During that time, the parties employed Marra to run PSDM. Marra was given an option to buy the company for $800,000 but he never exercised the option. The only year that the business did not make a profit was 2009. The trial court also referred to the 4/11 agreement which gave David exclusive control over PSDM. It also stated that David used the PSDM income to pay his attorney and to pay his bills.

The trial court then noted, "Both sides presented accounting experts in regard to valuation of PSDM . . . ; Lynne Bushore for the Petitioner and Adam Ochoa for the Respondent. Ms. Bushore stated that the value of PSDM was $508,000 . . . Mr. Ochoa stated that the value of PSDM was $258,327 through 2011 . . . Ms. Bushore testified that she used three different approaches in order to get a value for PSDM; the asset approach,

8

the income approach and the market approach. The asset and income approaches both used numbers available from the business' accounting books and tax returns. The market approach compared like-business sale values. As it regards to the market approach, Ms. Bushore said it was difficult to find a sale of a business that was like PSDM, finding only one in Las Vegas for $292,000 in 2005. Ms. Bushore also averaged in the $800,000 arms-length price from the 2009 Portener/Marra option to buy contract. Ms. Bushore considered the trade-in-kind ($2,600 a month) that PSDM received as income when determining value and cash flow and specifically stated that Adam Ochoa's cash flow was incorrect by not including it as income. Ms. Bushore also pointed out that Mr. Ochoa's report had misstated the income numbers for PSDM for 2007-2011 which he used in his calculations, including not including accounts receivable. Mr. Ochoa, who used the three approaches used by Ms. Bushore, in turn argued that Ms. Bushore was wrong in adding into the calculations the $800,000 2009 option-to-buy figure; as it was not a market determined value, had not been optioned and was therefore valueless and her ending valuation was too high. Mr. Ochoa also argued that the trade-in-kind did not have value and should not be used as income for cash flow purposes. Mr. Ochoa also stated that the accounts receivable were not recoverable because of their age and therefore should not be added as income to any valuation of the business."

The trial court then made the following findings: "The Court finds that both CPA reports are faulty when it determines business value. The Court finds that Ms. Bushore's use of the non-optioned $800,000 in her valuation of PSDM is not justified and her overall valuation of the business in [sic] over-inflated. On the other hand, the Court is

highly suspicious of Mr. Ochoa's 2011 business valuation, especially when it starkly contradicts his 2010 valuation. Mr. Ochoa's failure to include accounts receivable is also a concern. The Court finds that his 2011 valuation is undervalued. To buy a distributor franchise today would cost between $30,000 and $60,000. The Court finds that the 2005 of like-business sale used in both market approaches is helpful in determining value. Even though it is seven years old, the $292,000 represents a true sale for comparison and occurred right before PSDM's best income years, 2006-8, and before the economy took a turn for the worse. It is also helpful to the Court that Ms. Bushore pointed out that for the first half of 2012, with the Respondent in charge, PSDM income was showing signs of going back to the 2006-2008 income numbers. The 2005 like-business sale, best represents what the market value of PSDM is today." The trial court's final ruling was that PSDM was worth $320,000 and awarded the business to David.

C. *Analysis*

We conclude the trial court's determination of the value of PSDM, and the underlying reasons for it, given the broad discretion afforded to the court to determine the value of community assets as long as its determinations are within the range of the evidence presented, was proper. (*In re Marriage of Nichols, supra,* 27 Cal.App.4th at p. 670.) As set forth, *ante*, both parties presented competing experts on the value of PSDM. Both experts employed three different approaches to reach an average: Ochoa determined based on looking at three different approaches the average value of $258,327 and Bushore determined it was $508,000. The trial court expressed its concerns as to both valuations. However it was bound to reach a decision on value. (*In re Marriage of*

10

*Cream, supra,* 13 Cal.App.4th at pp. 89-90.)  It relied on a like-business that was sold during a similar economic time.  A final determination of $320,000 cannot be deemed an abuse of the trial court's vast discretion.

Susan assumes that the trial court only relied on the market approach and the market value was improper because there was no way to determine the actual market value of PSDM.  She insists the market value approach was improper because "[t]here were insufficient comparisons to use that approach exclusively."  Susan provides no case law that supports her claim that the trial court's determination was not the fair market value.  "An appellant must provide an argument and legal authority to support [her] contentions.  This burden requires more than a mere assertion that the judgment is wrong . . . ."  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  The evidence presented supported the fair market value as determined by the trial court.

Susan argues that there was an offer for the business from Audrey Weber of $500,000 that should have been considered as the fair market value.  The trial court's statement of decision did not include this evidence.  However, Susan made no objections to the statement of decision.  As such, we can imply the trial court properly disregarded this testimony and find that Susan has waived her right to complain that the trial court disregarded this evidence by failing to object to the statement of decision.  (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1132, 1138.)

Susan's reliance on *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874 is misplaced. In that case, the reviewing court held that an expert's evaluation of a business – which was held by stocks – failed to constitute substantial evidence, as the record demonstrated that the expert applied a defective method or made factually unfounded assumptions. The court concluded that the trial court could not compare a closely-held small company to a larger, publicly-held corporation. (*Hewitson, supra,* at pp. 884-886.) This case does not involve the same error. There is no evidence to support that the Las Vegas business was unlike PSDM. Susan provides no relevant legal authority to support that the trial court could not use the one business to show the value.

Based on the foregoing, the trial court did not abuse its discretion by valuing PSDM at $320,000.

III

NEGATIVE EQUITY IN MARITAL RESIDENCE

Susan contends that the trial court should have either considered the Palm Desert house and the HELOC on the house as zero equity, or forced a short sale of the house in order to maximize the estate. She insists that a "zero value" would maximize the value to the estate. She also insists the court could have ordered a short sale or had the parties sign a deed in lieu of foreclosure in favor of the lender.

The parties stipulated that their Palm Desert residence was worth $420,000. The first mortgage debt on the house was $391,460. Prior to separation, the parties took $135,000 from the HELOC to remodel. After they separated, Susan took out $27,000 to pay her attorney fees and other items. David took out $10,000 for a community property

12

debt to pay an attorney who had represented both David and Susan in a lawsuit, and $10,500 to pay a community tax consequence. After David found out about the withdrawals by Susan, he took out the remaining amount on the HELOC totaling $116,000. He used that amount to pay his attorney fees and household debts.

In its division of property, the trial court gave the Palm Desert house to David and he was given the equity of $28,540. He then was given all of the HELOC debt on the Palm Desert house which totaled $299,940. He was then awarded all of PSDM, to divide the remaining property equally and was ordered to pay an equalization payment of $23,800. Additionally, Susan would receive $4,500 each month in spousal support.

Susan provides an argument with irrelevant legal authority regarding the award of the HELOC "negative equity" to David. (*Craddock v. Kmart Corp.* (2001) 89 Cal.App.4th 1300, 1307 ["We need not consider an argument so poorly articulated. [Citation.]".)

We can surmise that Susan's argument is that since David created the debt in the HELOC he should not benefit from having been awarded all of the value of PSDM to equalize the estate. However, as set forth *ante*, part of the HELOC was incurred while they were still married, part was due to her withdrawals for her attorney, and other amounts were used to pay community debts. This argument relies upon David having breached his fiduciary duty by taking out the remaining $116,000 after the 4/11 agreement. However, as will be set forth, *post*, the trial court did not err by finding that David did not breach his fiduciary duty. Moreover, David will be required to pay back

13

this entire debt and the order stated, that "each party will indemnify and hold the other harmless from the debts awarded to the other pursuant to the property division sheet, and to defend the other at their own expense, against any claim, action, or proceeding that is hereafter brought seeking to hold the other party liable on account of debts assigned to the other party, including reasonable attorney fees incurred by the other of such claim, action or proceeding." Susan will have no liability on the HELOC debt even if David defaults on the debt.

As previously stated, the family court is obligated to divide the community estate equally. (*Duncan, supra,* 90 Cal.App.4th at p. 631.) "[T]he court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.]" (*Id* at pp. 631-632.) The trial court did not abuse its discretion by awarding both the house and PSDM to David, and then requiring him to pay all of the HELOC debt.

IV

BREACH OF FIDUCIARY DUTY

Susan claims that David breached his fiduciary duty to her based on three theories. Initially, she claims he breached the general presumption of a fiduciary duty. She also claims he violated Family Code section 721 which required a fiduciary duty for the management and control of community property. Finally, she claims that David breached his post-separation fiduciary duties as stated in Family Code section 2100 through 2113.

14

A.    *Fiduciary Duty*

Family Code section 721, subdivision (b) provides in pertinent part:  "[A] husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other.  This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.  This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code."  "[Family Code s]ection 721, subdivision (b) . . . , makes clear that the duty to disclose relevant information concerning transactions affecting the community property is an affirmative and broad obligation."  (*In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1269 (*Margulis*).)

"The fiduciary duty of the parties under the Family Code is to make 'a full and accurate disclosure of all assets and liabilities in which one or both parties have or may have an interest.'  (§ 2100, subd. (c).)  The disclosure 'must be made in the early stages of a proceeding for dissolution of marriage . . . regardless of the characterization as community or separate, together with a disclosure of all income and expenses of the parties.'  [Citation.]  The duty of disclosure is ongoing and requires each party to update and augment any prior disclosures fully and accurately.  [Citation.]"  (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1319.)

15

"Taken together, these Family Code provisions impose on a managing spouse affirmative, wide-ranging duties to disclose and account for the *existence*, *valuation*, and *disposition* of all community assets from the date of separation through final property division.  These statutes obligate a managing spouse to disclose soon after separation all the property that belongs or might belong to the community, and its value, and then to account for the management of that property, revealing any material changes in the community estate, such as the transfer or loss of assets.  This strict transparency both discourages unfair dealing and empowers the nonmanaging spouse to remedy any breach of fiduciary duty by giving that spouse the "information concerning the [community's] business" needed for the exercise of his or her rights . . . "  (*Margulis, supra,* 198 Cal.App.4th at pp. 1270-1271.)

Section 2107, subdivision (c) requires the imposition of monetary sanctions and reasonable attorney fees if a party does not "comply with any portion of the chapter of the Family Code that deals with a spouse's fiduciary duty of disclosure during dissolution proceedings, i.e., sections 2100 to 2113."  (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1477 (*Feldman*).)  The statute provides, "'[s]anctions shall be in an amount sufficient to deter repetition of the conduct or comparable conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust.'  [Citation.]"  (*Ibid*.)

16

We review the factual findings regarding sanctions under a sufficiency of evidence standard and the rejection of sanctions under an abuse of discretion standard. (*Feldman,* at pp. 1478-1479.)[1]

B.     *Evidence and Findings*

As previously discussed, prior to April 2011, Susan and David worked together to run PSDM, or Susan ran PSDM.  Starting in April 2011, David took over the household expenses and running PSDM.  David gave Susan monthly accountings of PSDM.  David admitted moving money from PSDM to his personal account — which was anywhere from $3,000 to $15,000 each month — to pay household expenses.  David also admitted paying his attorney fees with his credit card.  The RV had an additional 10,000 miles put on it after their separation.  After the 4/11 agreement, Susan withdrew $27,000 from the Palm Desert HELOC and $9, 990 from the HELOC for the Canada house.  David took $116,000 from the Palm Desert HELOC to pay household expenses.  Susan testified she had no idea that David was spending so much on his credit cards but did receive notice of the monthly withdrawals from PSDM.

The trial court made the following findings as to breach of fiduciary duty:  "Even though the court takes notice that the Respondent took higher personal draws than the Petitioner, and paid personal credit card bills through the business after 4/11, no evidence

---

[1]     In her opening brief, Susan states in the standard of review portion of her brief that the breach of fiduciary duty is subject to de novo review because it involves an interpretation of the statutes.  However, in her argument she does not contend the trial court erroneously interpreted the statutes but rather that the evidence supported the sanctions.  Review is not de novo.

17

was presented in court that demonstrated that the payments were inconsistent with the Respondent's obligations under the 4/11 stipulation. On cross-examination, the Respondent showed that the personal credit card bills were for the son's school expenses, medical and insurance bills, attorney's fee and business expenses. The $116,000 taken out of the PD HELOC was in response to the Petitioner's own previous withdrawals, and there was no showing that the business has been left with a burdensome debt that would impede income production. The miles put on the RV are insignificant and the court notes that certain amount of wear and tear on a recreational vehicle is to be expected. The mileage put on by parties during the two year period is not unreasonable and did not depreciate the values of the RV substantially. The 4/11 stipulation entered into by the parties and their attorneys was vague and did not clearly demarcate each party's rights and responsibilities. The Respondent thought he had been granted exclusive use and control of PSDM and acted reasonably per the terms of the 4/11 agreement. The Petitioner reasonably thought the 9/10 agreement was still in effect as to payment [of] attorney's fees because the 4/11 agreement didn't specifically deal with attorney's fees." The trial court ruled, "Court finds that within the context of the stipulations between the parties, no one party acted in bad faith and does not find any breach of financial duty."

C.      *Analysis*

Susan essentially argues that David breached his fiduciary duty by spending an enormous amount of money after April 2011. She insists the money was used to pay David's personal credit cards and expenses. She complains David did not notify her of the expenses between April 2011 and August 2012 or that he had taken money from the

18

Palm Desert HELOC. She claims, "David's mismanagement of PSDM after the April, 2011 agreement violated his duty of care to Susan. David's refusal to disclose monthly accountings to Susan upon her request violated his duty to disclose."

Initially, Susan has failed to provide this court with the monthly accounting that David gave to Susan despite the fact that they were admitted as exhibits. Susan argues that although these monthly accountings listed the payments of household expenses, they were too "broad." The trial court found that David had accounted for the household expenses. David testified that he was paying the household expenses and his attorney fees with the draws from PSDM. Moreover, Susan admitted that the monthly statements showed the draws that David was taking out of PSDM. On appeal, we presume the trial court's order to be correct and indulge all intendments and presumptions to support it regarding matters as to which the record is silent. (*Denham v. Superior Court, supra,* 2 Cal.3d at p. 564.) It is the defendant's burden to show error by an adequate record. (*In re Kathy P.* (1979) 25 Cal.3d 91, 102.) Based on the record before this court, the trial court did not abuse its discretion by finding that David had accounted for all of the expenses.

It is clear that David did not advise Susan he withdrew the $116,000 from the Palm Desert HELOC. He used that money to pay household expenses. While this may have violated his duty to disclose, it was proper for the trial court to consider that Susan had engaged in the identical conduct. She had withdrawn over $50,000 from the Palm Desert and Canada HELOCs and had provided no explanation or an accounting to David.

Clearly, based on the actions of both parties, the imposition of any sanction under these circumstances would be "unjust." (*Feldman, supra,* 153 Cal.App.4th at p. 1477.)

Additionally, as found by the trial court, the stipulation between the parties provided that David had exclusive control over PSDM and paying the household expenses. Susan signed the agreement. David acted with "substantial justification" in using PSDM funds to pay household expenses and the HELOC when that was insufficient. (*Feldman, supra,* 153 Cal.App.4th at p. 1477.) Finally, we note that David filed income and expense declarations throughout the proceedings.

Based on the foregoing, substantial evidence supported the trial court's findings and it did not abuse its discretion by denying sanctions.

V

ATTORNEY FEES

Susan contends that David should have been ordered to pay $75,000 of her attorney fees as requested in the trial court.

Initially, we note that in her argument Susan does not make one citation to the record in this case to support her argument. For lack of citation to the record, we deem her argument to be forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743 [failure to cite to the record waives the claim of error].) Record citations in the defendant's statement of facts are insufficient to meet the requirement for pertinent record citations in the record. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16.) As such, Susan has forfeited her claim on

20

appeal. Even if we were to consider the claim, we cannot conclude that the trial court abused its discretion.

A.      *Attorney Fees*

Family Code section 2030, subdivision (a)(1) provides that in a marital dissolution proceeding, the court "shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." Subdivision (b) of Family Code section 2030 provides that "Attorney's fees and costs within this section may be awarded for legal services rendered or costs incurred before or after the commencement of the proceeding."

Family Code section 2032, subdivision (a) provides: "The court may make an award of attorney's fees and costs under Section 2030 or 2031 where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." Family Code section 2032, subdivision (b) provides: "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own

21

attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances."**2**

"On appeal, we review an attorney fee award under section 2030 for an abuse of discretion. [Citation.]" (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662.) "'[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' [Citation.]" (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866.)

B.     *Evidence*

Susan withdrew $27,000 from the Palm Desert HELOC to pay her attorney fees. Susan filed a declaration on June 7, 2012, that her attorney, Barbara Kristal, would no longer take her case because she owed her $39,000. On June 14, 2012, David was ordered to pay $25,000 for Susan to hire a new attorney. The parties were ordered to sell the Canada home, and when that occurred, they would split the proceeds minus $25,000 for attorney fees given to Susan. Susan obtained a new attorney, Sheila A. Williams, on June 28, 2012. Susan owed over $120,000 in total attorney fees for four different attorneys. David incurred over $55,000 in attorney fees and did not seek reimbursement.

---

**2**     Susan also claims attorney fees should have been awarded under Family Code section 271 as a sanction based on David's conduct during the litigation. We have found no unseemly conduct by David. No fees under section 271 were warranted.

22

In addressing attorney fees, the trial court ruled, "The Respondent does have the ability to reimburse the Petitioner for some of her attorney's fees. The Court is also not unaware of the disparity of attorney fees between the parties. After the 4/11 stipulation, the Petitioner was effectively left without an adequate source to pay her attorney's fees. She also couldn't help the fact that one of her attorneys, Ms. Krystal, left abandoned her on the eve of trial. Additional attorney's fees would to [sic] be expected. The Court does note also that pursuant to the Court's order of June 2012, the Respondent did give the Petitioner $25,000 for attorney fees, subject to reimbursement. However, the $25,000 came out of the business, not the Respondent's personal account, and the Petitioner does have a community interest in that $25,000." It then ruled, "The Respondent has the ability to reimburse the Petitioner for Attorney's fees and is ordered to do so in the following manner: The Respondent was awarded the Palm Desert HELOC debt, $27,000 of which was done by the Petitioner to pay her attorney. The Court orders the Respondent not to be reimbursed for the $25,000 advance he gave the Petitioner for attorney's fees after the sale of the Canada house."

We cannot conclude this ruling was an abuse of discretion. The trial court exhaustively reviewed the factors in section 4320 that required it to consider the earning capacity of both spouses, the needs of each party based on the standard of living during the marriage, the obligations and assets of each party, and the balance of hardships to each party. It ordered spousal support to Susan in the amount of $4,500. David bore the cost of his own attorney fees and Susan was effectively awarded $52,000 towards her attorney fees. David was ordered to pay all of the debt on the HELOC and Susan was not

23

given any debt.  Susan has failed to show that "considering all of the evidence viewed most favorably in support of its order, no judge could reasonably make the order made." (*In re Marriage of Keech, supra,* 75 Cal.App.4th at p. 866.)

## VI

## DISPOSITION

The judgment is affirmed.  Appellant to bear her own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
Acting P. J.

We concur:

KING _____
J.

MILLER _____
J.